(No. 26772.—

MAX RITTENBERG, Appellant, *vs.* FRANK J. MURNIGHAN *et al.,* Appellees.

*Opinion filed November 18, 1942.*

SHULMAN, SHULMAN & ABRAMS, (MEYER ABRAMS, of counsel,) for appellant.

DAVID H. BRILL, (JACOB G. GROSSBERG, of counsel,) for appellee George E. Goldberg.

NASH, AHERN, McDERMOTT & McNALLY, (MARTIN J. McNALLY, of counsel,) for other appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

The appellant, Max Rittenberg, filed his complaint in the superior court of Cook county, seeking to declare a certain trust agreement void, and for other relief arising out of the following facts:

268

The Sheridan-Argyle Hotel Company was incorporated under the laws of the State of Illinois pursuant to a reorganization plan under 77B in the Federal District Court, whereby the property known as the Copeland Hotel and now known as the Somerset Hotel, located at the corner of Sheridan road and Argyle avenue, Chicago, was conveyed to the corporation, free and clear from the first mortgage bond issue lien and subject to all unpaid taxes and reorganization expenses.

Under the terms of a trust agreement dated June 21, 1937, the first-mortgage bondholders were given trust certificates which represented shares of capital stock of the defendant Sheridan-Argyle Hotel Company, held and owned by the trustees under the agreement for the use and benefit of the persons to whom trust certificates had been issued. The bondholders had the option of remaining as trust-certificate holders under the trust or of withdrawing from the trust at their will and of obtaining the common stock in lieu of their trust certificates.

The plaintiff is a holder of a trust certificate for 15 shares of common stock of the Sheridan-Argyle Hotel Company. The defendants, Frank J. Murnighan, Harry W. Solomon and Frank Lynn, are the three trustees under the trust agreement and are likewise the only directors and officers of the corporation.

The trust agreement provided that during the period of the trust, the trustees should possess the full legal title to all the capital stock and power to exercise all rights of shareholders, including full power to vote; that the shareholders should have no right in respect to any of the stock held by the trustees; that the right of the trustees to vote included the right to vote for directors, and the power to lease all property of the corporation; full power to withhold monies for the payment of taxes, compensation, expenses and necessary liabilities of trustees; and that dividends from the income should be paid to the participating

certificate holders. The trust agreement was dated June 21, 1937, expiring on June 21, 1947, with a provision for a termination at the expiration of each two-year period upon the vote of a majority at a referendum or meeting of the certificate holders. The trustees were also given power to amend the trust agreement by resolution of all of the trustees. Out of 7,275 outstanding shares of the corporation, 5,863 were held by the trustees.

The trustees managed the hotel from 1937 to 1941. The property was in an extreme need of rehabilitation, not having been rehabilitated in six or seven years. Accumulated taxes and penalties, at the time the trustees took over, amounted to $120,123.84. The trustees' first year of operation showed an increase of $16,000 over the last year of the Federal court trusteeship and in the second year was $23,000 over the last year of the Federal court trusteeship's management. In 1940 revenue began to drop, apparently due to the poor physical condition of the property.

Prior to the fall of 1940 the trustees at several times considered leasing the entire property, but had decided against this measure. During this time the hotel consisted mainly of apartments, which were rented out on a year-to-year basis. During the fall of 1940, because of the apparent drop in revenue, the trustees decided to lease the entire property to a tenant who would extensively rehabilitate the hotel. Other hotels in the district had been receiving extensive rehabilitations, making it necessary in order to compete with these hotels that the Copeland (Somerset) Hotel likewise be rehabilitated.

On the trial the plaintiff stipulated that it was to the best interest of the corporation and shareholders and the holders of the trust certificates that a lease of the hotel property be executed on December 31, 1940. On November 6, 1940, the trustees adopted a resolution authorizing the solicitation of bids to lease the hotel property, providing in the resolution that all bids were to be submitted not later

than November 27. It so happened that the defendant George E. Goldberg submitted a bid on the property, which bid was dated October 21, 1940, and was made after the trustees had already had two general discussions relative to the advisability of leasing the property. Only four bids were received, all of which were discussed on November 27, 1940. The highest and best bid was that of George E. Goldberg for a rental term of ten years at $36,000 per year minimum, with an additional rental of 33⅓ per cent of the gross in excess of $125,000 a year and 40 per cent in excess of $140,000, attaching thereto a deposit of $10,000 and agreeing to a rehabilitation program satisfactory to the officers of the company and the bidder. The testimony showed that Goldberg was an able, experienced and successful hotel operator, which was admitted by the plaintiff. The trustees obtained two credit reports on him and also examined the property he operated.

Resolutions were adopted, accepting the Goldberg offer and authorizing the board of directors and officers to execute a lease with him on behalf of the corporation. Meetings were had from November 27 to December 26 as often as three times or more a week. The lease was drafted and redrafted and on the morning of December 26 each of the directors received a letter through the mail from a lawyer named Maxwell Rubin, submitting an offer on behalf of Joseph Stein for a lease of the hotel for ten years at a minimum of $40,000 per year. Stein's offer offered a $10,000 deposit which was not accompanied with the offer, and also offered $62,000 for rehabilitation, of which $18,000 was to be expended in the first year. The evidence showed that one of the trustees had had experience with Stein in the operation of the Pine Lodge Hotel, which was far from satisfactory and that the trustees discussed the Stein offer, coming to the conclusion that the Goldberg offer was a more satisfactory offer and that if they dropped the Goldberg lease, which was almost completely perfected, and

considered the Stein lease further, that the trustees possibly would end up without any lease at all, it being desired that a tenant be had by January 1, 1941. The trustees also determined that Goldberg was a better operator than Stein and that the additional percentage in the Goldberg offer was more desirable than the lesser percentage in the Stein offer.

On December 31, 1940, at a meeting duly called, the board of directors adopted a resolution authorizing the president and secretary of the company to execute a lease with Goldberg upon the terms submitted and providing that the lessee expend the aggregate sum of not less than $61,000 for rehabilitation during the entire term and that $10,000 be deposited to secure the faithful performance of the lease. The lease was on the same day approved and by the parties executed. Goldberg went into possession January 1, 1941. On February 11, 1941, the directors and trustees mailed a letter to all of the trust-certificate holders and shareholders advising them of the execution of the lease and the terms thereof.

The trustees failed to call the referendum meeting scheduled for June 21, 1941, and failed to send out the required sixty-day notice thereof, as required under article VII of the trust agreement. The trustees, therefore, amended the trust agreement and called a meeting for July 14, 1941, forwarding notices pertaining thereto, which meeting was called for the purpose of voting on the proposition whether the trust agreement should terminate as of June 21, 1941. At this meeting all the holders of the trust certificates present voted in favor of the continuance of the trust. At the time of the hearing in the superior court in January, 1942, a year after the execution of the lease, Goldberg had already spent more than $41,000 in rehabilitating the hotel. His rent was paid to date and it was apparent that a percentage rental would accrue to the corporation, possibly in the amount of $5,000, making a total

rental received by the corporation for the year 1941 of approximately $41,000. The proof also showed that during this period the hotel had reached a peak occupancy of approximately 95 to 97 per cent. Under the lease Goldberg was obligated to expend only $18,000 the first year for rehabilitation. Under the terms of the lease it was not possible to apply the excess of the amount expended in lieu of rehabilitation for any other year. Shortly after the execution of the lease, the trustees appropriated $4500 to themselves as salary which, however, the trustees allege was approved by a meeting of the shareholders and certificate holders long prior to the execution of the lease. This money was paid to the trustees from the general corporation account into which the $10,000 deposit by Goldberg, as security for the performance of his lease, was placed.

At the hearing in the court below, the plaintiff did not present any evidence as to the facts involved other than calling one of the trustees, under section 60 of the Practice Act. The defendants submitted in their proof the testimony of the three trustees and Goldberg, together with four real-estate and hotel men to substantiate that the rental of $36,000 was a fair rental for the premises and more than an appraisal made by some of them.

The relief sought in the complaint was, not only a finding that the trust agreement was void, but also that the trustees had been grossly negligent and were liable for their mismanagement, particularly in accepting a lease at a rental of $360,000 for a ten-year term, when a better lease with a rental of $400,000 was offered to them. The complaint further prayed that the court find and declare that the trust agreement was against the constitution of Illinois and, therefore, null and void.

The trial court found for the appellees and against the appellant on all the issues raised in the pleadings and specifically found that the trust agreement was not contrary to public policy, nor did its provisions violate article XI,

section 3, of the Illinois constitution. The appellant brings his appeal direct to this court on the ground that a constitutional question is involved.

It is with this last question that we are chiefly concerned. Section 3 of article XI of the Illinois constitution provides: "The general assembly shall provide, by law, that in all elections for directors or managers of incorporated companies, every stockholder shall have the right to vote, in person or by proxy, for the number of shares of stock owned by him, for as many persons as there are directors or managers to be elected * * *; and such directors or managers shall not be elected in any other manner." It is insisted by appellants that the trust in this case was a device to deprive the stockholders of their voting rights and to transfer such voting rights to the trustees.

The trust agreement was created, established and approved by a decree of the Federal court entered July 2, 1937, involving the hotel property here in controversy. It was created for the benefit of all the bondholders who surrendered their bonds for cancellation and received in lieu thereof certificates of beneficial interest in the trust. The shares of stock in the trust were issued to the trustees upon the formation of the corporation and the beneficiaries have never had title, ownership, or possession of the shares.

The purpose of the trust agreement as stated in the instrument was to secure continuity and stability of policy and management. The agreement was approved by all of those who became beneficiaries thereunder in accordance with the provisions of the Bankruptcy Act.

Such agreements in insolvency and foreclosure proceedings created under the supervision of the State and Federal courts have been used many times in Illinois during the past ten years and have been held valid, provided, always, that no actual fraud was involved in the transaction. This court had occasion to pass upon a similar plan and agreement in *Babcock* v. *Chicago Railways Co.*

325 Ill. 16. In passing upon and upholding the validity of a stock-trust agreement in that case the court said: "The depositaries by the agreement, as required by the plan, retain the title to the stock but by a declaration of trust agreed that all dividends paid or income received from deposited securities should be paid to the participation certificate holders * * * but that the depositaries should for five years * * * retain their power to vote the stock * * * and to take any step which the holders of such stock are entitled to take. There is nothing in this which is unlawful or contrary to public policy. Executors, administrators, conservators, guardians, receivers and testamentary or other trustees may vote the stock in their hands at all meetings of stockholders without regard to the fact as to who is entitled to receive the beneficial interest in the dividends or the stock itself upon distribution. A trustee who is registered in the stock register of a corporation as the owner of stock is vested with the legal and equitable title, subject only to the provisions of the trust, and has the right to vote his stock and is eligible to the office of director. (*People* v. *Lihme, supra,* [269 Ill. 351.]) Owners of property may create trusts in it for any lawful purpose, and a trust in the stock of a corporation for the purpose of controlling the corporation is not unlawful. (*Venner* v. *Chicago City Railway Co.* 258 Ill. 253.)"

The case of *Luthy* v. *Ream,* 270 Ill. 170, upon which appellant relies to support his conclusion that the trust agreement is repugnant to the constitution and contrary to public policy, is readily distinguishable from the *Babcock case.* In that case the stockholders by the agreement attempted to transfer to one Ream their voting rights. There was an attempt in that case to cause an illegal separation of the voting power from the ownership of the stock, which the court said could not be done. In the present case the holders of the trust certificates never were share-

holders of the corporation, and therefore there was no separation of the voting power from the ownership of the shares.

Almost the identical arguments advanced by the appellant here were presented in the *Babcock case, supra,* and in commenting upon the case of *Luthy* v. *Ream, supra,* the court said, "The decisions have no application to this case, for there is here no question of a proxy or its revocation, and if there were, there is an interest in the stock besides the right to vote it." Here the trust agreement provides that the trustees shall have an interest in the capital stock and that during the trust period the power of the trustees to act thereunder is irrevocable.

We feel that the constitutional question raised by appellant has been fully decided adversely to his contention in *Babcock* v. *Chicago Railways Co., supra.* Where a provision in the constitution has heretofore been construed by this court leaving no fairly debatable question, as a general rule the jurisdiction in the Supreme Court cannot be invoked by direct appeal. (*Hood* v. *Commonwealth Trust and Savings Bank,* 376 Ill. 413.) In *Perlman* v. *Thomas Paper Stock Co.* 378 Ill. 238, this court said: "In order to confer jurisdiction on this court to review a case on direct appeal from the circuit court on the ground that a constitutional question is involved, it must appear from the record that a fairly debatable constitutional question involving a construction of the constitution or the validity of a statute was urged in the circuit court."

There being no fairly debatable constitutional question involved in this appeal, the cause is hereby transferred to the Appellate Court, First District.

*Cause transferred.*